## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 10-20242-Cr-Altonaga

**UNITED STATES OF AMERICA,**
                    **Plaintiff,**

**v.**

**JOHN UTSICK,**
                    **Defendant.**
_____/

### DEFENDANT'S RENEWED MOTION TO DISMISS INDICTMENT FOR UNCONSTITIONAL GOVERNMENT INTERFERENCE WITH RIGHT TO ASSISTANCE OF COUNSEL AND TO EXCLUDE AND SUPPRESS TESTIMONY OF WITNESSES DERIVED DIRECTLY AND INDIRECTLY FROM VIOLATIONS OF <u>THE ATTORNEY CLIENT PRIVILEGE</u>

Defendant John Utsick, by and through counsel, pursuant to the hearing on this matter on April 5, 2016, hereby files his Motion to Dismiss the Indictment For Unconstitutional Government Interference With Right To Assistance Of Counsel and to Exclude and Suppress Testimony of Witnesses Derived Directly and Indirectly From Violations of the Attorney Client Privilege pursuant to the hearings in this case on March 25 and April 5, 2016.

The Indictment must be dismissed because the government's actions individually and together constitute violations of the defendant's constitutional rights to effective assistance of counsel. Specifically the government has:

1) used privileged documents and witness statements in its investigation (DE's 134 and 138, Exhibit A cover pages of memoranda written by accountant Steven Kelley working under privilege with and retained by Utsick personal attorneys, Exhibits X-1 and X-2 showing voluminous privileged ddocuments in possession of Receiver and distributed to SEC and DOJ);

2) threatening in court at the defendant's Initial Appearance in this matter to move to disqualify the defendant's attorney who had received funds from the defendant if the attorney continued his representation of the defendant (DE 18 and Exhibit F).[1]

---

[1] The Defendant at his Initial Appearance also originally advised the court that he had been diagnosed with and continued to suffer from Bi-polar 1 Disorder. He remains untreated. (DE 160)

By way of background, the parallel civil investigation initiated by the SEC[2] proceeded by obtaining 22 boxes of records from the defendant's personal attorneys and their accountants, and then co-opting these attorneys and their accountants to become the Receivership team that worked as their proxies throughout the government's investigation of the defendant.  At regular intervals the criminal investigators and the prosecutors themselves, without advising the defendant, met with these Receivership and SEC witnesses to coordinate and obtain information regarding the defendant's statements and activities. (see eg Exhibits J-1 and J-2, Exhibits X-1 and X-2).

The civil investigation was financed by the assets of the defendant's business, amassed by the defendant himself over many years through his promotion of thousands of concerts, his acquisition of ownership interests in multiple venues throughout the world, his acquisition ownership of theatrical content, and relationships and partnerships with some of the most influential promoters and brokers in the United States and the world. The investigation was conducted using the extensive statutory powers of compulsory process wielded by the Receiver and his lawyers and accountants, all of whom had been selected by the defendant and represented the defendant. (Exhibits K-1 and K-2, Exhibits X-1 and X-2).  The government is now basing its case in chief on the testimony of witnesses who were able to induce the defendant's cooperation with them during the civil investigation based on his desire to assist in the repayment of his businesses' loans to creditors and investors.[3]   This deceptive originating act of the government's entire investigation has corrupted and tainted the proceedings throughout, as it: 1) violates the attorney-client privilege (*Upjohn v. United States*, 449 U.S. 383 (1981); Florida Rules

---

[2] The details of the SEC investigation and government action are more fully addressed in a separately filed motion to dismiss.

[3] As discussed *infra*, these witnesses' communications with the defendant were legally privileged pursuant to their attorney-client relationship and should have been shielded from government access in the criminal investigation. Defendant neither waived this privilege nor authorized his personal attorneys and their accountants to testify against him in a criminal case. (Exhibit U, affidavit of defendant's then-attorney Michael J. Rosen) The entire criminal case has been investigated, constructed upon, and irremediably tainted by this original initiating violation.

Regulating the Florida Bar and Rules of Professional Conduct 4-1.7, 4-1.8, 4-1.9 and 4-1.10), 2) violates the defendant's right to effective assistance of counsel which has been continuously violated by the government throughout the civil and criminal proceedings *Luis v United States, 578 U.S. ___(2016), Brewer v Williams*, 430 U.S. 387 (1977); *U.S. v Stein,* 541 F.3d 130 (2d Cir. 2008);  and 3) abused the civil process by allowing the criminal investigation to use it as a Trojan Horse to breach numerous Fifth and Sixth Amendment constitutional protections that would have otherwise protected the defendant  *U.S. v Scrushy,* 366 F.Supp. 2d 1134 (N.D. Al 2005)*;   SEC v Healthsouth Corp,* 261 F. Supp. 2d 1298 (N. D. Al 2003).[4]  It is also part of an overarching pattern of continuing and even greater governmental misconduct that has prejudiced the defendant, and requires judicial intervention. *Bank of Nova Scotia v United States*, 487 U.S. 250 (1988); Stein v U.S., 541 F.3d 130 (2d Cir. 2008)

With the financial backing of the defendant's business assets[5] and with the defendant's attorney-induced cooperation with the civil process, the government was in fact able to amass

---

[4]  The Receiver's and SEC's original pleadings to the civil court note that the Receiver will have the "full cooperation" of the defendant, that the work of the Receiver will be "greatly enhanced" by the defendant's consent to his appointment, and that the Receiver will "continue to operate the business", (eg DE 4, 6-cv-20089). The alleged "consent" is a brief statement signed by the defendant, without any signature of counsel or representation of who his counsel could have been, or explanation of the veritable hornet's nest of conflicts of interest foreshadowing the entire proceeding. The statement references only that "it is in the best interest of the Borrowers (defendant) . . . that the Borrowers consent to the relief . . . for the appointment of a Receiver." (DE 1, 6-cv-20089).

[5] The civil and criminal investigation relied almost exclusively on the work of the Receiver and his team, almost all of whom were formerly the defendant's own attorneys and their accountants. The Receiver reported to the court in the original Receivership that "upon his appointment, the Receiver immediately started fully cooperating with the SEC by providing them all documents and information requested." (DE 26, 6-cv-209089) After the defendant allowed the Receiver to take control of his businesses, the Receiver and his team received at least $8,000,000 paid by the defendant's businesses.  (eg DE 100, 6-cv-20975, Exhibit L Receiver's Second Omnibus Motion for Fees for a portion of the time period and fees awarded to several of the defendants' former attorneys and accountants who became part of Receivership team.) At least two such attorneys and accountants are listed on the government's witness list. (DE 134) Additional attorneys and firms receiving fees pursuant to Receiver's motion, from the defendant's businesses, (now known as the "Receivership Estate") that represented the defendant in this very matter prior to the establishment of the SEC-approved Receivership include the law firms of Kluger Peretz Kaplan and Berlin, which the Receiver brought in as General Counsel, and attorney Russel Forkey. (eg Exhibit L)  Forkey, whether by oversight or selective disclosure,  is actually described in the Receiver's fee applications as having represented the defendant personally prior to his retention by the Receivership team. (eg DE 100, 6-cv-20975, Exhibit L page 7.) No such disclosure seems to have been made regarding the conflicting representation of the other fee recipients.

evidence and obtain cooperation which it now represents as the heart of its case that would not have been available to it in a purely criminal investigation.

The attorney-client privilege is fundamental to the legal systems of every jurisdiction in the United States.  The Supreme Court has thoroughly explained the primordial role it plays not only in assuring full and frank communication but also in promoting "broader public interests in the observance of law and administration of justice." *Upjohn v. United States*, 449 U.S. 383, 389 (1981). The privilege itself is the oldest confidential communications privilege known to the common law, *id*, and perhaps even more importantly for our purposes, it is additionally inextricably bound with the public as well as individual interest in the constitutionally guaranteed right to counsel, as expressly articulated in federal jurisprudence for well over 100 years. The Court has always recognized the necessity in the interest and administration of justice, of the assistance of lawyers, which requires the untrammeled exercise of this privilege. *Id* quoting *Hunt v Blackburn*, 128 U.S. 464, 470 (1888).

---

The SEC coordinated with and bootstrapped themselves into the Receiver's investigation even prior to inception of the Receivership, and then exerted control over it. As early as December, 2005, the SEC and the Receiver and his law firm were coordinating investigatory positions and tactics. Among the numerous documented communications were specific contacts between the Receiver – then representing and billing the defendant personally - and senior attorneys with the SEC who signed the SEC complaint including the Assistant Regional Director, Branch Chief, Senior Counsel, and Senior Trial Counsel. These individuals are the subject of a pending *Tuohy* request exhibited at H-1 and H-2. (Exhibit K-2, excerpt of Akerman invoices to Jack Utsick for SEC regulatory work.) Compare the SEC contacts in Exhibit K-2 with DE 1, 6-cv-20975 signature of SEC attorneys approving the Complaint. The SEC Assistant Regional Director, along with other SEC officials, is also listed as the SEC point of contact in its contemporaneous press release publicizing its own complaint. (Exhibit P, SEC press release dated April 17, 2006) The Receiver, while he and his law firm represented the defendant, also directed the imaging of the defendant's computer hard drive on his law firm account as early as December 30, 2005, three weeks before his court appointment. (Exhibit N, bill to Akerman Fort Lauderdale for computer imaging referencing Akerman client #166073, compare with Exhibits K-1 and K-2 Akerman bills to Jack Utsick with "client #166073 Jack Utsick regulatory matters.")

The SEC in its "agreed" motion for appointment of the Receiver relies on: 1) "The Defendants have agreed to the appointment, 2) The Receiver is "uniquely suited" for this task because he has already "been serving as the appointed Receiver", 3) The "Receiver intends to utilize several attorneys at Akerman", and 4) The Receiver "will look principally to . . . . the local law firm Kluger Peretz Kaplan & Berlin to assist him as counsel in this matter." (DE 3, 6-cv-20975 pp 2-3, Exhibit M).

In its coup de grace, the SEC represents ipse dixit to the court "the Akerman team has no conflict of interest in this matter . . . one. . . partner[s] . . . briefly represented Worldwide [the Defendant's wholly- owned corporation of which he was the only officer or director], that representation terminated prior to the *Big Four Oh* receivership [the existing Receivership the SEC successfully sought to merge into the SEC Receivership]  and [the Receiver] has represented that no conflict exists." (DE 3, 6-cv-20975, pp 3-4, Exhibit M.)

Lower federal courts in the application of this common law principle and constitutional right have recognized that safeguarding these joint public and individual interests means taking precautions as necessary in each case to assure that government actions respect the privilege and the right to effective assistance of counsel. In one such case of relevance for the dilemma facing us in the instant case, *Bittaker v Woodford*, 331 F.3d 715, 722 (9th Cir. 2003), the Circuit Court when confronted with articulating a rule of waiver construction regarding the privilege, held that " a narrow waiver rule —one limited to the rationale undergirding it—will best preserve the state's vital interest in safeguarding the attorney-client privilege in criminal cases, thereby ensuring that the state's criminal lawyers continue to represent their clients zealously." Conversely, anything other than a narrow waiver rule, as discussed below, would run counter not only to the privilege as legislatively pronounced in Florida but would harm the state's interest by dissuading the state's lawyers to represent their clients zealously.

Presaging the government's investigatory tactics in this case which consisted of using the Receiver's defense-funded investigation as its Trojan Horse, the *Upjohn* Court noted at 396 that "Discovery was hardly intended to enable a learned profession to perform its functions . . . on wits borrowed from the adversary." (quoting *Hickman v Taylor* 329 U.S. 495, 516 (1947) In this case as we have seen and discuss further below, the government's former adversary was manipulated into its fold.

Recently, the Supreme Court went to great lengths to make even more explicit the essential role of unconflicted counsel of choice in the administration of justice. The Court reiterated that this right is, among other attributes, "fundamental" and it is a "great engine by which an innocent man can make the truth of his innocence visible". *Luis v United States*, 578 U.S. ___ (2016) slip op. at 4.  The Court emphasized that the government undermines that right

at unequivocal constitutional peril; if the government does so "*the courts may not even ask whether the error harmed the defendant*" (Id at 4 emphasis added), the proceedings are tainted.

In contrast, the Court noted that other competing interests, though perhaps strong in other contexts, must yield.[6]

> Nor do the interests in obtaining payment of a criminal forfeiture or restitution order enjoy constitutional protection. Rather, despite their importance, compared to the right to counsel of choice, these interests would seem to lie somewhat further from the heart of a fair, effective criminal justice system. *Id*. at 12.

With the legal principles and constitutional rights and remedies established, we can now return to our examination of the government's conduct here.

The government has conducted its investigation based on information compiled by the Receiver and his attorney and accountants, all of whom originally represented the defendant John Utsick personally, prior to their petitioning the court for appointment as Receiver.  (Exhibits K-1, K-2, U) The government now includes on its witness list the Receiver and the lead accountant for the defendant's personal attorneys in 2005 who was subsequently retained by the Receiver precisely for this reason.  (DE 134)   Government investigators regularly conferred with and interviewed these individuals (Exhibits J-1 and J-2, X-1 and X-2) throughout the pendency of the SEC-initiated civil action.[7]

The government also has included on its exhibit list (most of the government descriptions seem purposefully vague, but this one is identifiable by date) privileged documents prepared by and for the defendant's former attorneys and their accountants. (DE 138, Exhibit A)[8]

---

[6] Mr. Utsick became indigent soon after the creation of the Receivership and the subsequent divestiture of his control of the business. The SEC opposed the release of funds by the Receiver from Mr. Utsick's businesses to pay his legal fees to defend himself on similar grounds, and prior to any adverse court finding against him regarding disgorgement. (Exhibit Q)

[7] The information obtained by the SEC and subsequent government investigators is both privileged and work-product. Where material is prepared in anticipation of litigation and constitutes mental impressions, it falls within the protection of the work product doctrine. *U.S v Bergonzi*, 216 F.R.D 487, 494 (N.D. California 2003).

[8] The government's demonstrated scouring of the SEC-obtained privileged information validates the frequently cited court rule that "possession, custody, or control of the government" as used in Rule 16 of the Fed Rules Crim

The government has also benefited from its decision to wait until the conclusion of the lengthy joint SEC-Receiver investigation which relied heavily on the work of the Receiver and his team of lawyers and accountants. This allowed the government to use this investigation, relying heavily on the defendant's continuing cooperation first established when the Receiver was part of the defendant's team of personal attorneys, as the basis for the present criminal investigation. The SEC-Receiver investigation used its access to records and statements provided to them by Mr. Utsick in 2005 continuously for nearly a year prior to the creation of the Receivership. The information provided during this period heavily informed the rest of the investigation, which could not have proceeded effectively without the information originally obtained as a result of the attorney-client relationship. The government now is using this for the criminal case.

The government also includes on its witness list an FBI analyst who has benefited from FBI interaction with the Receiver and his team of former defense attorneys and accountants and who has apparently interacted directly with them as well, incorporating privileged information into his review of the case. Additionally, FBI agents who have had access to the privileged information have discussed the case with all of the government witnesses, further spreading the use of privileged information and infecting the entire government case.

The Receivership itself was created by Mr. Utsick's personal attorneys in conjunction with the SEC in order to obtain Mr. Utsick's cooperation, which would not have otherwise been forthcoming had unconflicted outside attorneys and accountants who were not leveraging their privileged relationship with Mr. Utsick been involved.[9]   This induced cooperation should have

---

Proc and elsewhere includes materials in the hands of a governmental investigatory agency. *U.S. v Jordan*, 316 F. 3d 1215, 1249 (11th Cir. 2003).

[9] The vehicle for the original Receivership, created after consultation with the SEC (Exhibit K-2), was constructed by the Receiver and his law firm and the other law firm representing Mr. Utsick that switched representation to the Receivership, when they were still representing Mr. Utsick. They capitalized on Mr. Utsick's friendly business ties with the Yeager entities to manufacture the necessary lawsuit that allowed court jurisdiction, and obtained Mr.

provided the Receiver and the SEC the ability to assure the greatest possible return to lenders of their principal, particularly as much of the principal was invested both in tangible entertainment related assets, real property, and intellectual property, and valuable intangible assets such as good will with a network of the leading performance artists and promoters in the world.  In fact, the business continued as a going concern even after the Receiver assumed control due to the defendant's cooperation, his network of partners, and his continuing affiliation with the business.

The Receivership could not legally have been created by Mr. Utsick's own attorneys and then immediately subsequently operated by one of his own attorneys, in order to be used as a vehicle for the criminal prosecution of Mr. Utsick himself.  This violates the fundamental protection of the attorney-client privilege as well as the right to counsel.[10]

Mr. Utsick does not and did not waive this privilege or this right. Even if there had been an attempt by his then-attorneys to induce him to intentionally waive this privilege and  this right, this attempt would have required full and express disclosure to Mr. Utsick at a minimum that, among other risks, 1) he was waiving the attorney-client privilege for all-time and all-

Yeager's consent, through his attorney, to file a lawsuit for this purpose. Examination of the complaint illustrates that there was no real dispute between them at this time. Mr. Utsick had made all payments due to the Yeagers for many years, totaling over $100,000,000, and was not in arrears at the time of the filing of the lawsuit.  Mr. Yeager had no fear that Mr. Utsick would abscond or deliberately divert assets so as to avoid paying Mr. Yeager sums due in the future. The lawsuit simply asks for a Receiver in order to perform an "accounting".  Many of the allegations in the nominal complaint creating the Receivership would not have even been known to Mr. Yeager and his wife but for representations made by the lawyers representing Mr. Utsick prior to joining the Receivership. (DE 1, DE 4, 6-cv-20089).

[10] *Florida's Rules Regulating the Florida Bar and Rules of Professional Conduct 4-1.9* states "A lawyer who has formerly represented a client in a matter must not afterwards: (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent;  (b) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require when the information has become generally known; or (c) reveal information relating to the representation except as these rules would permit or require with respect to a client." *Rule 4-1.10* states "(a) Imputed Disqualification of All Lawyers in Firm. While lawyers are associated in a firm, none of them may knowingly represent a client when any 1 of them practicing alone would be prohibited from doing so by rule 4-1.7 or 4-1.9, except as provided elsewhere in this rule . . ." *Rule 4-1.8 (b)* states "Using Information to Disadvantage of Client. A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these rules."  *Rule 4-1.7 (b) (4)* requires for Informed Consent among other conditions: " ...each affected client gives informed consent, confirmed in writing or clearly stated on the record at a hearing." The defendant does not and has not ever provided such consent. (Exhibit U).

purposes, 2) his attorneys and specially-retained accountants would or could be testifying against him in a criminal proceeding following the civil one, 3) they would be using privileged statements and documents he provided to them - while they represented him in the underlying investigation - in a future criminal proceeding against him, and 4) they would be continuously lending their expertise and mental impressions and further providing these privileged statements and documents to the SEC, to the FBI and to government prosecutors to assist in such a prosecution. FRE 502. This we know from Mr. Utsick's criminal attorney at the time in question did not happen. (Exhibit U)

Adding to the difficulty or near-impossibility of obtaining a waiver in such a case is the bedrock requirement repeatedly put forth by the Supreme Court in some of the hallmark cases of its jurisprudence that such a waiver of fundamental rights be voluntary and knowing.  It is incumbent upon the State to prove "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v Zerbst*, 304 U.S. 458, 464 (1938).  "Courts indulge in every reasonable presumption against waiver." *Brewer v Williams*, 430 U.S. 387, 404 (1977) (citations omitted).  This strict standard applies whenever and wherever the Fifth and Sixth Amendment guarantees are implicated. These guarantees protect not only the defendant but also the entire criminal process and apply not just at indictment but at every critical stage that may implicate a fundamental right in a future trial proceeding.  *Schneckloth v Bustamonte*, 412 U.S. 218, at 238 – 239 (1973).

Florida has a particularly strong statutory presumption against finding waiver without clear intent. As this District has explicitly held in the attorney-client privilege/waiver context governed by Florida law: "We are taught from first year law school that waiver imports the "intentional relinquishment or abandonment of a known right."  *Georgetown Manor, Inc. v. Ethan Allen, Inc.* 753 F.Supp. 936 at 938 (S.D. Fla 1991) quoting *Mendenhall v. Barber–Green*

*Co.,* 531 F.Supp. 951, 954 (N.D.Ill.1982).  In the case of the attorney-client privilege, it is the client who holds the privilege and who must be found to have intentionally waived his rights." *Smith v. Armour Pharm. Co.,* 838 F.Supp. 1573, 1576 (S.D.Fla. 1993).[11]

Where the defendant's purported waiver of the attorney-client privilege is obtained by the same attorneys who are not only parties to the privileged communications but also seek to work with the government in its investigation of the defendant and then provide the privileged information at the government's request for use in a criminal investigation and prosecution of the defendant, the inherent conflict overwhelms any conceivable implied intent.[12] Yet, just such a surreal claim of waiver is what the government has posited here (DE 169 page 5).

The government without elaboration claims that the Receiver, a partner at the law firm that represented Mr. Utsick personally throughout 2005 and billed him for nearly a thousand hours of legal work for SEC "regulatory matters" performed up to and including the January 18, 2006 start date of the Receivership, "took over" the defendant's businesses and holds the "privilege" as to "both companies."[13]  According to the government's rationalization, the

---

[11] Yet another complication regarding any finding of waiver of such a fundamental privilege and conflict of interest in this case arises from Mr. Utsick's diagnosed bipolar 1 disorder (Exhibit E), which would have potentially rendered him incapable in any event of intentionally waiving a conflict of interest in his attorneys' successive representation of him and the Receivership Estate or of waiving his right to keep attorney communications confidential.

[12] The instant Receivership may be the first in any district in which the Receiver was, in the weeks and the very day before obtaining court-appointment so as to cooperate with the SEC without concern for the defendant's legal interests, billing the defendant directly for legal work representing him in a privileged capacity on the identical SEC regulatory matters that gave rise to the Receivership. (Exhibits K-1 and K-2)

[13] The Receiver himself billed defendant for 59 hours of legal work as his attorney for SEC regulatory matters starting on December 16, 2005 through January 17, 2006. This legal work included lengthy conferences with Mr. Utsick and his legal team present including: several partners from the Receiver's law firm, two partners from the law firm that became General Counsel to the Receiver on January 18, 2006 (raising more irremediable conflict issues), Mr. Utsick's long-term personal and business attorney who was retained by the Receiver (adding even more conflict issues), the accountants retained by Mr. Utsick's legal team (and are on the government's witness list for the criminal trial) , and the remaining attorneys who were not subsequently retained by the Receiver and continued to represent Mr. Utsick. This legal work also included conferences with named and unnamed attorneys at the SEC who are the subject of a separate pending *Tuohy* request for testimony.  (Exhibits H-1 and H-2)
The Receiver and his partners also billed Mr. Utsick for reviewing several drafts of the complaint and related documents that were filed with the court by the nominal plaintiffs – the "Yeager entities" – in the lawsuit

Receiver - who with his law firm represented Mr. Utsick on these SEC regulatory matters and in conjunction with this engagement obtained from him privileged statements and documents, and who then executed legal maneuvers coordinated with the SEC to obtain court-appointment - transmogrified literally overnight from January 17 to 18 2006 from  Mr. Utsick's attorney into Receiver, and then presto waived Mr. Utsick's claims of privilege as to communications made to the Receiver himself and his law firm.

This Jekyll and Hyde act is presumably permissible according to the government's cursory defense of it, because of the separation of the business' legal structure from that of Mr. Utsick as an individual. Mr. Utsick is the sole owner, President, and principal of two entities of which he was the exclusive operator: 1) The Entertainment Group Fund, Inc  a Subchapter S corporation incorporated in Florida, and 2) World Wide Entertainment,  Inc a Subchapter C corporation incorporated in Delaware.  In its legal representation of Mr. Utsick, the Receiver's law firm communicated exclusively with him or his personal attorneys, or on his behalf.  Mr. Utsick personally engaged the Receiver's law firm. All invoices and legal communications were sent to Mr. Utsick.  The SEC has sought and obtained a disgorgement order concerning Mr. Utsick personally, but not from his businesses.

Only for purposes of arguing waiver of the attorney-client privilege does the government attempt to make a distinction between Mr. Utsick and his businesses. This distinction was not made at the time of the legal representation at issue; nor could it have been meaningfully made in that context as no other individual possessed any legal or apparent authority to bind the business

---

that served as the vehicle for the original court-appointment of the Receiver.  (The SEC later filed a complaint against the Utsick and Yeager businesses on April 14, 2006 in which the SEC sought and obtained a court-order for the Receiver to expand his authority to include the SEC allegations.)  The Receiver's partners billed Mr. Utsick for another 229 hours during this same period for work including: responding to SEC subpoenas for his personal and business records, inventorying Mr. Utsick's offices (in which he also resided), and imaging Mr. Utsick's computer hard drives.  (Exhibit N) Ultimately the Receiver's law firm provided voluminous records to the SEC in December and January in response to SEC requests and prepared voluminous privileged work-product materials, immediately prior to seeking and obtaining court-authority for the Receivership.

in any decision. The legal representation and billings and work were expressly for Mr. Utsick personally.  This alone obviates the government's rationalization regarding waiver.

Nor is the government's explanation even consistent with representations it made to the court in order to secure the court's approval of the Receivership initially. Contrary to what the government is now telling this Court, the SEC implied that a conflict would be problematic but advised the court that approved the Receiver when it sought to expand the original Receivership in its Agreed Motion for Appointment of a Receiver that:

> [The Receiver] has informed the Commission that the [law firm] team has no conflict of interest in this matter, and is ready, willing, and able to serve as a Receiver and as counsel to the Receiver in this case. Although [the Receiver] advised the Commission that one of his partners at [law firm] briefly represented Worldwide, that representation terminated prior to the *Big Four Oh* receivership and [the Receiver] has represented that no conflict exists.  (brackets added, Exhibit M, DE 3, p. 4 6-cv-20975).

The statement renders the government's conduct and the entire investigation even more problematic in several respects. The Receiver and the Commission had been in contact regarding the Receivership from December 15, 2005 when the Receiver and his law firm were actively representing - and billing Mr. Utsick for hundreds of hours of privileged legal work – on SEC regulatory matters. This included responding to SEC subpoenas and other inquiries, imaging Mr. Utsick's hard drives, producing voluminous boxes of documents for the SEC and as associated work-product which was subsequently provided to and used  by the Receiver, taking inventory of Mr. Utsick's office/residence, drafting and re-drafting the complaint and related documents that served as the vehicle for the Receiver's original approval by the court on January 18, 2006, and dozens of hours of meetings with Mr. Utsick personally and the rest of his defense team. (Exhibits A, K, N, X).

Contemporaneously with the filing of this pleading the SEC issued a press release (Exhibit P) heralding its own efforts in filing a civil action against Mr. Utsick, "the third-largest

independent entertainment promoter in the world", and its request for an appointment of a Receiver. Although Mr. Utsick had not admitted any of the allegations in the complaint, and the legal process had not even begun, the release quotes the Director of the Enforcement Division proclaiming about the evils of "fraudulent schemes" and that "We will continue to vigorously enforce the securities laws against those who engage in such schemes." The Director of the Regional Office makes a similar proclamation regarding affiliations with celebrities and the release goes on to breathlessly name drop some of Mr. Utsick's clients and performing acts such as Shania Twain, Elton John, Santana, The Pretenders, and Aerosmith.[14] The SEC release, anticipating relatively extensive publicity for the case, names in the release two attorneys as "contacts" for information about the case. The first name, one of the named SEC officials in the pending *Tuohy* request, is specifically identified as one of the SEC officials who spoke to – or met with - the Receiver in the December 16, 2005 – January 17, 2006 time period in the middle of the intense flurry of legal work performed by Mr. Utsick's attorneys in response to the SEC subpoenas to him.

Given the publicity the SEC attempted to reap with its investigation of Mr. Utsick, the high level SEC officials who were touting their own investigation, the extensive communications between the SEC and the Receiver's law firm, and the direct communications between the Receiver and SEC attorneys directly involved in the SEC investigation while the Receiver and his law firm were billing large numbers of hours to Mr. Utsick for their privileged work in representing him in this investigation, it is perplexing that the SEC would represent to the court overseeing its case against Mr. Utsick that there was "no conflict of interest in this matter." (Exhibit M, DE 3 p. 4 6-cv-20975) Idem for the SEC's representation to the court that there was a "brief" representation by the Receiver's law firm that terminated prior to the *Big Four Oh*

---

[14] In one paragraph the SEC release intones that "most of the entertainment projects lost money" while in the next it helpfully informs that "it was impossible for defendants to determine the profitability of any event." (Exhibit P)

Receivership which started on January 18, 2006. The so-called "brief" representation began at least in April, 2005 and continued through January 18, 2006, the authorization date of the *Big Four Oh* Receivership.  (Exhibits K-1 and K-2)[15]  It is more than ironic that the SEC, after congratulating itself for its aggressive pursuit of Mr. Utsick for allegedly making incomplete or inaccurate disclosures regarding his far-flung business operations (as the SEC emphasized he was the third largest promoter in the world at the time they filed their legal action against him), would make such misrepresentations to the court regarding the central element of one of their most self-publicized cases. For Mr. Utsick as well as the public interest, the consequences of this SEC misrepresentation go beyond irony and directly contributed to the government's tramelling of his attorney-client privilege, its continuing interference with Mr. Utsick's constitutional right to effective counsel, and to counsel of his choice.

The SEC followed this misrepresentation with its opposition to the defendant's use of his business assets, even when he was indigent and before any criminal or even civil finding against him, to help with his legal representation in the SEC's lengthy legal action against him.  (Exhibit Q)[16]  The SEC further successfully moved for a court order of disgorgement regarding fees he had paid prior to the Receivership for legal representation the SEC deemed would benefit him in a subsequent criminal matter, which did not begin until 2013. (Exhibits U) The government delayed indicting the defendant until the end of the limitations period, over one year after the disgorgement order, and even then sealed the indictment based on false representations about the defendant's flight risk (DE 6 Exhibit B) and did not execute it for three more years further

---

[15] The law firm bills are in the name of Jack Utsick for services performed for Jack Utsick. The SEC press release of April 17, 2005  headlines in large font Jack Utsick.

[16]  The SEC's opposition was unprincipled and selective, designed solely to interfere with Mr. Utsick's constitutional right to counsel, thereby denying the public and investors with their compelling and legally protected interest in effective representation of the parties. For example, over the defendant's objection, the SEC authorized enormous sums (at least $700,000) for legal fees incurred by attorneys for the DiSalvo Estate whose beneficiaries profited from $30,000,000 embezzled from Mr. Utsick's businesses. (DE 1 exhibit A, 6-cv-21582 and DE 313, 6-20975 and DE 320, 6-20975). Even Mr. Utsick's employees had their attorney fees reimbursed with the accord of the SEC. (Exhibit L).

pressuring him financially and psychologically, and depriving him of the legal protection meant to be afforded by the statute of limitations.[17]   When the government did finally seek the defendant's arrest, it did so with false representations of his crimes through diplomatic channels to Brazilian authorities. Not content to seek his unlikely arrest through the Extradition Treaty on mere fraud charges, the government added charges more motivating to the Brazilian authorities - rape, child molestation, incest, and assault - knowing the illegal arrest and subsequent conditions of confinement would further weaken the defendant before he even returned to face the real charges.  (Exhibit C and Exhibit W) After causing his confinement under these conditions to last as long as possible by further violating the Extradition Treaty Article XIII (Exhibit G and Exhibit W), the government then threatened with legal action, in order to cause his recusal from the case, the lawyer who came to represent the defendant at his initial appearance. (Exhibit U, Exhibit F) By itself, this act could constitute a violation of the government's "affirmative obligation" imposed by the Sixth Amendment, "not to act in a manner that circumvents and  thereby dilutes the protection afforded by the right to counsel." *Maine v Moulton*, 474 U.S. 159, 170-171 (1985) quoted in *Stein*, 541 F. 3d at 154.   When viewed in their totality, as they must be, the government's acts of misconduct spanning ten years certainly constitutes unjustified governmental interference with Mr. Utsick's right to defend himself which is a "structural" error not subject to harmless-error review. *Stein* at 157.

The defendant has not waived (Exhibit U), and does not waive, his privilege with respect to the use of communications and documents passed between him and his attorneys and their accountants during their representation of him in a criminal proceeding. Nor does he waive his privilege with respect to the subsequent work done by these attorneys and their accountants

---

[17] Note that the fact that some of the government's actions and misrepresentations to U.S. authorities occurred prior to indictment (they also continued after Indictment) in no way vitiates the additional Sixth Amendment claims which are structural and not even subject to harmless error review. "The fact that events were set in motion prior to indictment" cannot save the government from the consequences of interfering with the ability of the defendant to pay for counsel post-indictment. *Stein* 541 F. 3d at 153.

which was informed by their use of privileged information which the government also seeks to use in this criminal proceeding. The testimony of these attorneys and their accountants, along with the testimony of any witnesses who have been exposed directly or indirectly to privileged information, must be excluded or suppressed as violative of the defendant's attorney-client privilege as well as his fifth and sixth amendment rights.[18]

Government investigators exposed to privileged information have in turn interviewed other witnesses that the government has listed on its witness list, repeating to them or running the risk of repeating to them privileged information they improperly obtained and otherwise tainting the interviews by communicating with witnesses after they had improperly accessed privileged information. (Exhibits X-1 and  X-2) Further, all government agents who have learned of statements made by the defendant's former attorneys and their accountants must be excluded from testifying or assisting the government at trial.

With respect to other witnesses testifying for the government, the government must establish that they were not interviewed by government agents or attorneys who accessed information and statements obtained in violation of the attorney/client privilege.

Further, the totality of the government's conduct as it relates to interference with his constitutional right to counsel and his attorney-client privilege must be examined from the perspective of the impressive totality of constitutional rights violated.  Rather than conduct a

---

[18] The SEC systematically targeted Mr. Utsick's ability to pay his civil and criminal legal expenses by selectively seeking and obtaining disgorgement regarding his payments to non-Receiver affiliated attorneys who worked contemporaneously with the Receiver's law firm and with what became the Receiver's General Counsel's law firm, and with the accountants and attorney they later brought with them to the Receivership, and then successfully opposing the release of his business funds to pay his subsequent civil and criminal expenses (Exhibit U, Exhibit Q). Pursuant to this strategy, the government threatened to bring selective legal action against the attorney who represented Mr. Utsick at his initial appearance. (Exhibit U, Exhibit F) No other recipient of payments from Mr. Utsick other than his perceived criminal attorney was the subject of such an actual or threatened legal action.  This distinction represents government interference with and undermining of Mr. Utsick's constitutional right to counsel as articulated in _Luis_. See also _U.S. v Stein_, 541 F.3d 130 (2d. Cir. 2008) which extensively discusses similar government interference and dismisses all charges against the defendants. In _Stein_, the Court also upheld as a further basis for dismissal the trial court's finding that the government's interference with the defendants' ability to seek funds from third parties such as the Receivership Estate for legal fees – as Mr. Utsick sought and seeks – in addition to violation of the right to counsel, additionally "shocks the conscience." _Id_. at 142.

criminal investigation through the grand jury with subpoenas, target letters, advice of rights, session deadlines, formal cooperation agreements subject to court supervision, and the other traditional trappings of a criminal investigation the government chose the path of a stealth criminal investigation using non-criminal processes that originated with its trammeling of Mr. Utsick's attorney-client privilege.[19] The interference with Mr. Utsick's privilege and his right to effective counsel of choice enabled the government to continue unimpeded through a lengthy series of legal and  constitutional violations, any one of which by itself causes concern about the integrity of the process and the respect of legal and constitutional rights, and which in totality admit of but one resolution – dismissal of the charges. The government's conduct includes, in addition to the unfettered trammeling of the attorney-client privilege:

1) its purposeful delay in indicting Mr. Utsick,
2) its decision to indict him under seal[20] without notification to his attorney just prior to the expiration of the limitations period,
3) its selective motion to disgorge only legal fees paid to his attorneys who did not join the Receivership,
4) its opposition to the release of any of his funds tied up in his business and subject to the Receivership for his legal defense at any point during the ten year pendency of the Receivership,[21] 5) its three year post-indictment delay in seeking the arrest of Mr. Utsick,
6) its false representations pursuant to an Extradition Treaty process to obtain his arrest and his confinement pursuant to unnecessarily degrading conditions due to those false accusations,
7) its delay of the extradition process at least twice by seeking the Brazilian Supreme Court to reconsider its interpretation of Brazilian law barring any enhancement of punishment for Mr. Utsick for alleged conduct prior to November 30, 2005,

---

[19] This relates to the violations of due process rights elucidated in *U.S. v Tweel*, 645 F. 2d 310 (5th Cir. 1981) and *U.S. v  Scrushy*, 366 F. Supp. 2d 1134 (N.D. Alabama 2005). See also *U.S. v Parrott*, 248 F. Supp 196 (D.D.C. 1965) (deliberate choice to hold criminal prosecution in abeyance to profit from fruits of civil proceedings, combined with delay, mandated dismissal of indictment.) (Exhibits X-1 and X-2)

[20] The reasons provided by the government to support sealing of the indictment were: 1) that the defendant might flee the jurisdiction – a statement at odds with the government's previous extensive discussions regarding the defendant's relocation three years earlier to Brazil, 2) that the defendant was a threat to witnesses – an unsupported statement apparently abandoned by the government, and 3) that the government was continuing its purported grand jury investigation – although there is no evidence that the grand jury issued or intended to issue a single subpoena subsequent to the indictment which was shortly followed by the expiration of the limitations period.  (Exhibit B, DE 6)

[21] As the Supreme Court has repeatedly emphasized and is discussed above, the zealous legal defense of Mr. Utsick would have served the public interest.  The Second Circuit phrased it thusly: " [I]t is in the government's interest that every defendant receive the best possible representation he or she can obtain . . . it cannot also be in the government's interest to leave defendants naked to their enemies." *Stein* at 157.

8) its further 6 month delay in violation of the mandatory time limits of the Extradition Treaty in picking up Mr. Utsick from the Brazilian prison system after the Extradition process had been terminated, and

9) its public threats to selectively bring legal action against the attorney representing him at his initial appearance when no other recipient of payments identified in the disgorgement order were so threatened (Exhibit U, Exhibit F).

The defendant therefore seeks dismissal of the charges. "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding. . . In a government of laws . . . For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Olmstead v United States*, 277 U.S. 438, 471 at 479, 485 (1928).

In the event the charges are not dismissed, the defendant seeks: a hearing on all issues raised in the motions to dismiss in the invent the Indictment is not dismissed, exclusion of all evidence and witnesses tainted by the government's violation of the attorney-client privilege with a hearing on non-excluded witnesses' exposure to witnesses who have been tainted by exposure to privileged information; exclusion of evidence risking exposing the defendant to liability for acts taking place prior to November 30, 2005; the release of Mr. Utsick from pre-trial detention; and a hearing and Order compelling the individuals named in the pending *Tuohy* requests to cooperate with defendant at a hearing or trial in providing information relevant to issues raised in this motion.

The defendant also incorporates here by reference the arguments and authorities contained in his Response in Opposition to Government's Motion to Exclude Evidence. (DE 164).

Respectfully Submitted,
s/ Eric Lisann
Eric Lisann, Esq.
Pro Hac Vice
Email: eric.lisann@lisann.com

18

**Lisann Law International PC**
6841 Elm Street
Suite 1275
McLean, VA 22101
Telephone: 703-989-6214
s/ David S. Weinstein
David S. Weinstein, Esq.
(As Local Counsel)
Fla. Bar No. 749214
Email: dweinstein@cspalaw.com
**Clarke Silverglate PA**
799 Brickell Plaza
Suite 900
Miami, Florida 33131
Telephone: (305) 377-0700
Facsimile: (305) 377-3001

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2016, the undersigned electronically filed the foregoing

document with the Clerk of the Court using CM/ECF

s/ Eric Lisann
s/ David S. Weinstein

19