# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 10-CR-20242-CMA

**UNITED STATES OF AMERICA,**
            **Plaintiff,**

**v.**

**JOHN UTSICK,**
            **Defendant.**
_____/

### <u>DEFENDANT'S MOTION FOR KASTIGAR HEARINGS RE: GRAND JURY, DETENTION, AND TRIAL; MOTION FOR GRAND JURY TRANSCRIPTS AND COLLOQUY; AND MOTION TO DISMISS FOR GOVERNMENT'S INABILITY TO PROVE GRAND JURY EVIDENCE FREE OF TAINT</u>

The defendant, John P. Utsick, by and through undersigned counsel, moves the Court for the legally-required Kastigar[1] hearing to assess whether the government can meet its burden of proving that its evidence and colloquy presented to the grand jury were free of taint from evidence obtained through its violation of Mr. Utsick's attorney-client privilege and his Fifth Amendment privilege against self-incrimination, and its violation of Mr. Utsick's Fifth and Sixth Amendment rights to counsel, and effective assistance of counsel of his choice. Mr. Utsick also renews his pending motions for a hearing pursuant to Kastigar to assess whether his detention pre-trial was lawfully obtained – including whether the government has truthful and accurate evidence supporting characterization of Mr. Utsick as a flight risk as well as whether the government can demonstrate it has evidence it can prove is free of taint that it can introduce if this matter is allowed to go to

---

[1] *Kastigar v. United States*, 406 U.S. 441 (1972).

trial.[2] Because Mr. Utsick remains detained he asks that this hearing be scheduled as soon as possible.

Failure by the government to prove the evidence it presented by proffer or witness to the grand jury was free of taint, direct or indirect, requires dismissal of the Indictment.[3] Should the government be unable to make the legally required proof of lack of taint, whether direct or indirect, Mr. Utsick renews his motion for the immediate dismissal of the Indictment.

Mr. Utsick also moves the Court to Order the government to immediately produce the transcripts and colloquys of grand jury proceedings related to this Indictment, pursuant to the specifically applicable provision of Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) which mandates disclosure for this motion. Mr. Utsick further moves the Court to Order the government to disclose these transcripts and colloquys pursuant to 6(e)(3)(E)(i) to aid Mr. Utsick during his preparation for hearings and a trial, if it occurs, in this matter. These materials will also need to be produced pursuant to the Jencks Act should any government attorney or witness who appeared before the grand jury be called as a witness by any party to these proceedings.

These grand jury materials are relevant not only to the instant motion to dismiss the Indictment for the introduction to the grand jury of evidence derived directly and indirectly from violations of the attorney-client privilege and in violation of the Defendant's Fifth and Sixth Amendment rights, but also to the pending motions to

---

[2] DE 173, DE 180, and DE 188. The Defendant has also repeatedly moved on the record for the enforcement of its Touhy request, identifying at least some of the witnesses involved in the violation of Mr. Utsick's attorney-client privilege, that witnesses testify in this regard both at trial and at the pre-trial hearing required in the event the Indictment is not dismissed beforehand.
[3] This is subject to harmless error analysis.

2

dismiss the Indictment and suppress evidence for a broad array of legal and constitutional violations.

As detailed previously in the pending motions (DE 173 and DE 180), the government has: 1) violated the statute of limitations, 2) violated the Defendant's right to Speedy Trial,[4] 3) departed from the proper administration of justice in enabling a civil investigation to violate Mr. Utsick's right to counsel and privileged consultation with his attorney, 4) caused the illegal arrest of the Defendant by making false statements as part of an Extradition Treaty thereby depriving this Court of personal jurisdiction over the Defendant, 5) violated the Extradition Treaty by making false statements in official diplomatic documents which requires the dismissal of the Indictment, 6) failed to provide to the Court or to the defense materials in its possession, that it had itself generated, greatly limiting the criminal sanction that could be imposed in this matter pursuant to the Rule of Specialty, 7) violated the Defendant's Fifth and Sixth Amendment rights to effective assistance of counsel and to counsel of his choice,  8) obtained the bulk of the evidence in its case by violating the Defendant's attorney-client privilege, 9) violated the Defendant's privilege against self-incrimination by violating his attorney-client privilege, 10) engaged in a protracted and profound pattern of misconduct that is "shocking and outrageous" such that it violates Due Process, and 11) engaged in a protracted and profound pattern of misconduct that violates constitutional rights,   statutory rights, *jus cogens* norms of international law, and/or judicial integrity such that the Court's exercise of its supervisory powers to dismiss the Indictment is required.

---

[4] DE 187 identifies both further delay and prejudice to the defendant caused by the government's false statements to the court at the pre-trial detention hearing. The government's false statements at the detention hearing were aided by its previous threats at the Initial Appearance to use its discretion to bring legal proceedings against Mr. Utsick's original criminal counsel unless counsel agreed not to remain as counsel. Thus new counsel was forced to handle the subsequent detention hearing. DE 187.

Preliminarily, the Court must examine whether the intrusion into the attorney-client privilege is so profound in this case that no Kastigar-type hearing can remedy the damage that it has caused. Mr. Utsick continues to maintain that this is the case and that dismissal of the Indictment without the need for a Kastigar-type hearing is mandated. The government conspired with the Defendant's attorneys in this matter to effectuate their switch from defendant to government, concealed that conspiracy from the court so as to engender Court approval and jurisdiction, and then proceeded to assemble a one-sided criminal case based almost exclusively on the work of the defendant's co-opted attorney.[5]

In *United States v. Schell*, 775 F. 2d 559 (4th Cir. 1985), the Fourth Circuit adopted a *per se* rule mandating dismissal of charges pursuant to the Fifth Amendment when an attorney switches sides and implicates the Jekyll and Hyde scenario at work in the instant case. In *Schell*, two of the defendants had briefly retained an attorney who represented them solely for the purposes  of their testimony as witnesses before a grand jury, before terminating his representation. Subsequently, the attorney joined the United States Attorney's Office where he was precluded by the office from working on the investigation of those defendants. The attorney did, however, question other witnesses in front of the grand jury which elicited responses that mentioned his former clients. The Fourth Circuit found that this alone was enough to mandate dismissal of the charges against them.

The confidentiality of the attorney-client relationship is severely compromised, if not destroyed, when, after representing a client, a lawyer joins in the criminal prosecution of that client with respect to the identical matter about which the attorney originally counseled the client. Such switching of sides is fundamentally unfair and inherently prejudicial. Without question, the client's right to a fair trial, secured by the due process

---

[5] This is detailed in DE 180.

4

clauses of the fifth and fourteenth amendments, is compromised under these circumstances. *Id*. at 565.

In this case, Mr. Utsick's attorney, with the assistance of the government, which made incomplete disclosures to the court, obtained court approval to become Receiver and work extensively with the government, including prosecutors and agents, in crafting the criminal case against him. The Receiver immediately made available to the government documents and statements made to him by the defendant while the Receiver was his attorney which became the core of the government's criminal case.[6]   This situation requires immediate dismissal of the Indictment.

A similarly unsettling example of government interference with the attorney-client relationship occurred in *United States v Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991).  That court found:

> …the shocking tale of a criminal defense attorney who was oblivious to the professional norms of ethical behavior and a cast of overzealous agents and prosecutors who facilitated the attorney's unethical conduct in an attempt to catch "a big fish." *Id*. at 1512.

In *Marshank*, an attorney provided his mental impressions to the government during the investigation of his former clients, while maintaining contact with the clients so as to do the government's bidding.  The attorney reaped monetary rewards as a result of his cooperation with the government.  The *Marshank* court found the situation, including the government's attempt to defend it, "astonishing", *id*. at 1520, and, with respect to the government's assertion that the defendant had waived the attorney's

---

[6] All of this is documented in DE 180.

conflict of interest, "simply galling", *id*. at 1528, among other findings.[7]   More to the legal point, the court found the government's conduct to be far more than "outrageous" enough to justify dismissal of the indictment both as a due process violation, and additionally as an exercise of the court's supervisory powers to preserve judicial integrity. In fact, the court dismissed the indictment on four separate grounds, though obviously one would have been enough. In sum, the court dismissed the indictment because: 1) the government interfered in the attorney-client relationship and violated the defendant's fifth amendment rights, *id*. at 1523, 2) the government's conduct was "outrageous" and fundamentally unfair and violated the defendant's fifth amendment rights, *id*. at 1524, 3) the government violated its affirmative obligation not to interfere with the defendant's choice of counsel in violation of the defendant's sixth amendment right to counsel, citing *Maine v Moulton*, 474 U.S. 159 (1985),[8] *id*. at 1525, and 4) the government's conduct required the court to invoke its supervisory power to dismiss the indictment to promote judicial integrity as well as to deter future government misconduct, *id*. at 1529.

   *Marshank* has many obvious similarities to the instant case.  The defendant was represented by an attorney who became the central cog in the government's case against him. The government rewarded the attorney for switching sides. The government did not disclose this to the court. The government attempted to convince itself and the court that the conduct did not interfere with the defendant's rights by the post-hoc construction of a waiver that was uninformed and corrupted by conflict of interest. The government had

---

[7] With respect to waiver of the conflict of interest, the court held that such an attorney conflict of interest must be disclosed in court and on the record before an inquiry into whether it was knowing and voluntary could even begin. Id. at 1528.
[8] Had the *Marshank* case been active today, the Supreme Court opinion in *Luis v United States,* 578 U.S. ___ (2016) would have provided further support.

scant evidence other than what was provided by the suddenly adverse defense attorney. This conduct is more than enough to require a legal finding of "outrageousness" mandating dismissal of the indictment.

The instant case exceeds even *Marshank* in the scope and breadth of government misconduct. After co-opting the defendant's attorney to become Receiver, the government starved out the attorneys who replaced him by cutting off the defendant's access to legal fees and used the defendant's funds to finance their own case and the co-opted attorney. When the defendant's counsel of choice appeared at the Initial Appearance, the government threatened him with a legal action directed solely against him, but not against any of the other defense attorneys who switched sides. Exhibit K-3.

After running off defendant's counsel of choice,[9] the government proceeded to run unimpeded in the fields of revisionism in its proffer to the Court at the detention hearing. The government liberally used ex parte procedures to seal the indictment under dubious circumstances, depriving the defendant of the protection of the statute of limitations and of his right to Speedy Trial. Having dubiously obtained the sealing of the indictment, the government used the cloak of secrecy to fabricate odious charges against the defendant to secure his arrest in a foreign land in a maximum security prison where no American lawyer would have local access to him. The government brazenly violated the applicable international treaty by providing false information to the Brazilian authorities to obtain the defendant's arrest, and then provided misleading documents and statements about the process to the Court and to the defendant, while boasting of its

---

[9] The government is compounding the prejudice it is causing by refusing to acknowledge that there is no basis for these threats, by refusing to acknowledge its conflicted position, and by abusing its conflicted position to interfere with the Defendant's ability to call this attorney as a witness.

7

actions.   Contrary to the government's insouciant representations to the Court, this conduct is not, and cannot, represent its finest hour.

Realistically, even if the Court somehow disagreed with the findings of the *Schell* and *Marshank* courts, given the complete absence of any measures taken by the government to even pretend to mitigate the damage caused by such a profound conflict of interest and violation of the attorney-client privilege, the 11th Circuit has explained that the government faces a next to impossible task in salvaging its investigation. As a practical matter, satisfying the heavy burden in a Kastigar hearing requires the prosecutors to show that they and their agents were not only aware of the problem but further followed reliable procedures for segregating tainted evidence and its fruits from prosecutors and agents. *U.S. v Hampton*, 775 F. 2d 1479, 1490 (11th Cir. 1985)

In *United States v Rasco*, 262 F.R.D. 682, 688 (S.D. Ga 2009) (noting that the Hampton observation applies any time a Fifth Amendment privilege is implicated in obtaining an indictment) the court surveyed the significant 11th Circuit cases on this subject and found that "where the record shows irreparable taint, courts terminate the prosecution outright; close cases warrant full *Kastigar* hearings." *Id*. quoting *United States v Schmidgall*, 25 F. 3d 1523, 1532 (11th Cir. 1994).

Nothing remotely close to responsible segregation of tainted evidence occurred here. At all times the government proceeded in total ignorance, whether willful or blissful, of the pervasive ramifications of the obvious privilege problem, in which it was itself complicit. This Court must terminate this prosecution outright.

There is nothing in the record to demonstrate that the government has presented any evidence to the grand jury, or is capable of producing any evidence if this matter

were actually permitted to proceed to trial, that is free of taint. The government made a decision to premise its entire criminal case on: 1) the statements of the defendant's former attorney and his retained accountant allegedly repeating what the defendant told them when they represented him, or on 2) the books and records the defendant produced upon order of his own attorneys in order for the Receiver to contrive purported financial records the government would need in a criminal case. The criminal investigatory tools at the government's disposal were used simply to menace and harass the defendant with the ever present threat of a pre-dawn raid, or to effectuate conversations with former business associates implicitly demonstrating that a potential criminal case awaited further business efforts by Mr. Utsick, or to bolster otherwise unsubstantiated media comments about unproved but endlessly pending sealed charges.[10]

This decision was made by the government despite knowing that the Akerman law firm including the Receiver, along with the Kluger Peretz Berlin law firm, had represented the defendant for nine months (in Akerman's case) immediately prior to the start of the Receivership, and had retained as part of its representation of the defendant the very accountants upon whom the Receivership also relied. The bulk of the work performed by these accountants was accomplished in the putative legal service of the defendant and paid for by the defendant just prior to the start of the Receivership. The Akerman law firm and the Kluger Peretz Berlin law firm (which became General

---

[10] This manipulation of the civil and criminal processes is an example of the improper administration of justice used to strike charges in *United States v Scrushy*, 366 F. Supp. 2d 1134, 1140 (N.D. Alabama 2005). "Because this is a case where the government has undoubtedly manipulated simultaneous criminal and civil proceedings, both of which it controls, 'there is a special danger that the government can effectively undermine rights that would exist in a criminal investigation by conducting a de facto criminal investigation using nominal civil means. In that special situation the risk to individuals' constitutional rights is arguably magnified.' *Sterling National Bank v A-1 Hotels International*, 175 F.Supp.2d 573, 579 (S.D.N.Y 2001)" *quoting SEC v Healthsouth Corp.*, 261 F.Supp.2d 1298, 1326 (N.D. Al 2003). The combined effect of the government's actions and misconduct also requires dismissal.

Counsel to the Receiver), together with the government, conspired to install Akerman as the Receiver, with complete control over the Receivership funds.[11]

This process was reiterated early on in the criminal investigation, well prior to the Indictment in this case, in meetings between the prosecution and investigating case agents and the Receiver. The Receiver even provided them the names of the SEC officials who provided their approval of Akerman's overnight transformation from defense attorney to Receiver.[12] The prosecutors and case agents then spent considerable time reviewing the SEC complaint and related court filings seeking court approval of Akerman as Receiver, (years later even citing it to the Brazilian authorities as a key part of their investigation), in which the SEC falsely declares to the United States District Court that Akerman had no conflict of interest in the matter, because Akerman never represented the defendant.[13]

Still the government continued its leisurely pace forward in its investigation, allowing seven years to pass before seeking to arrest the indigent defendant and to finally unseal the Indictment, without using the criminal investigatory powers of the grand jury or taking any steps at all to mitigate taint. The government was demonstrably content to rely almost exclusively, in its distant criminal case, on the privileged materials it had conspired to obtain from the defendant.

---

[11] As another example of the government's duplicity and concealment of material facts to the courts it has interacted with in this matter (in addition to those shown in DE 173 and 180 and other pleadings), consider the selective disgorgement of attorneys fees. Akerman, Kluger Peretz Berlin, and Michael J. Rosen all represented defendant together at the same time, and were paid with the same funds. The government has only sought disgorgement from the defendant of the fees paid to Rosen, the sole attorney of the defendant who did not join the Receivership, and also the one who as a criminal attorney, presents the strongest claim to the funds. *Exhibit K-3*.

[12] The SEC officials specifically cited in this process are then-Assistant Regional Director Teresa Verges, and attorneys Yolanda Gonzalez and Andre Zamorano. The defendant has requested their testimony at both trial and pre-trial hearings in this matter.

[13] This is detailed with exhibits in DE 180.

Once a defendant demonstrates that privileged materials have been obtained by the government in its investigation, the government bears the "heavy" burden of proving the absence of taint in the grand jury and in the trial evidence. *Hampton,* at 1485, quoting *Kastigar* at 461. Mere denials of taint are insufficient, even if made in good faith. The government must systematically establish, on the record, step by step, item by item, legitimate and independent sources for each and every item of evidence presented, free of poisonous fruit. This means no leads or any shaping of any witness testimony through questioning by investigators can be derived from the privileged material.[14] The defendant bears no obligation at all in this regard. *Id.* at 1530.  Otherwise the indictment must be dismissed. *Hampton*, at 1487-1488. The protection against self-incrimination has been violated.  *U.S. v. Schmidgall,* 25 F.3d 1523, 1528 (11th Cir. 1994).

As the privileged material here was obtained at the outset of, and continuously consulted throughout the entirety of, the criminal investigation, the government's obligation is manifestly impossible for it to obtain in this case.

> Any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom. *North I* at 853 *quoting Boyd v United States*, 116 U.S. 631-32 (1886).

> The privilege against self-incrimination is

> "the essential mainstay of our adversary system", the Constitution requires "that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of

---

[14] The government must prove that no evidence was "derived, shaped, altered, or affected" by any exposure to the privileged testimony. The government must further prove that no witness drew in any way upon privileged material. *U.S. v Martinez*, 81 F. Supp.3d 1046, 1054 (D. Co. 2015) *citing* among others *U.S. v North I*, 910 F.2d 843, 872 (D.C. Cir. 1990) and *U.S. v North II*, 920 F2d 940, 943 (D.C. Cir. 1990).

compelling it from his own mouth." *North I* at 853 *quoting Miranda v Arizona*, 384 U.S. 436, 460 (1966).

The Defendant therefore moves this Court to order the dismissal of the Indictment because it was obtained using evidence that the government cannot prove was completely free of taint.

In the alternative the Defendant moves for the immediate production by the government of grand jury transcripts and colloquys, and for the government to meet its burden, at a Kastigar hearing, of proving that evidence it introduced at the grand jury, and that which it will introduce at trial, and that which it will produce at any detention hearing, is directly and indirectly free of all taint from privileged information.

Pursuant to Local Rule 88.9, undersigned counsel has contacted AUSA John Gonsoulin, who opposes the defendant's requests contained within this motion.

Respectfully Submitted,
s/ Eric Lisann
Eric Lisann, Esq.
Pro Hac Vice
Email: eric.lisann@lisann.com
**Lisann Law International PC**
6841 Elm Street
Suite 1275
McLean, VA 22101
Telephone: 703-989-6214
s/ David S. Weinstein
David S.Weinstein, Esq.
(As Local Counsel)
Fla. Bar No. 749214
Email: dweinstein@cspalaw.com
**Clarke Silverglate PA**
799 Brickell Plaza
Suite 900
Miami, Florida 33131
Telephone: (305) 377-0700
Facsimile: (305) 377-3001

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 17, 2016, the undersigned electronically filed

the foregoing document with the Clerk of the Court using CM/ECF

<u>s/ Eric Lisann</u>
<u>s/ David S. Weinstein</u>